UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| *PERFICIENT, INC.* | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| *CHRISTINE LIVINGSTON* | ) | Cause No. |
| Serve: 173 Gaynor Place | ) | |
| Glen Rock, NJ 07452 | ) | |
| | ) | |
| | ) | |
| *PROTIVITI, INC.* | ) | |
| Serve: CT Corporation System | ) | |
| 120 S. Central Avenue | ) | |
| Clayton, Mo 63105 | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT

COMES NOW Plaintiff Perficient, Inc. ("Perficient"), by and through its attorneys Sandberg Phoenix & von Gontard P.C., and for its action for damages and injunctive relief against Defendants Christine Livingston and Protiviti, Inc. ("Protiviti"), hereby alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

**A.**   **Parties**

1.     Perficient is a corporation organized under the laws of the State of Delaware having its principal place of business in St. Louis County, Missouri.  Perficient is licensed and qualified to transact business in the State of Missouri.

2.     Livingston is a citizen of the State of New Jersey, and has engaged in business activities in Missouri, including the activities complained of herein.

3.      Protiviti is a corporation organized under the laws of the State of Delaware having its principal place of business in San Mateo County, California.  Protiviti is licensed and qualified to transact business in the State of Missouri.

**B.      Jurisdiction and Venue**

4.      This Court has jurisdiction on the basis of agreement between the parties; as set forth in greater detail below, Perficient brings a claim for breach of contract in relation to the Restricted Stock Award and Non-Competition Agreement entered into by Perficient and Livingston ("Non-Competition Agreement"), which provides in relevant part:

> **32.      Submission to Jurisdiction**. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE EASTERN DISTRICT OF MISSOURI OR THE COURTS OF THE STATE OF MISSOURI LOCATED IN THE COUNTY OF ST. LOUIS, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

5.      A true and accurate copy of the most recent Non-Competition Agreement between Perficient and Livingston is attached hereto as *Exhibit A-1*[1] and incorporated herein by reference.

6.      Additionally, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states and the amount in controversy exceeds $75,000.

---

[1] Perficient and Livingston agreed to the Non-Competition Agreement on an annual basis, as set forth below, which are attached to the Complaint as Exhibits.

14958422.v1

7.      This Court has personal jurisdiction over Livingston pursuant to section 506.500.1(2) RSMo because she engaged in conduct in Missouri giving rise to the facts and circumstances at issue in this lawsuit and has sufficient minimum contacts with Missouri to satisfy any due process concerns.

8.      In addition, this Court has personal jurisdiction over Livingston pursuant to the submission to jurisdiction clause contained in the Non-Competition Agreement. *Exhibit A-1.*

9.      This Court has personal jurisdiction over Protiviti pursuant to section 506.500.1(1)-(3) RSMo because it transacts business within Missouri, has committed multiple torts against a Missouri plaintiff, tortuously interfered with contracts entered in Missouri, and has sufficient minimum contacts with Missouri to satisfy any due process concerns.

10.     This Court further has personal jurisdiction over Protiviti pursuant to the submission to jurisdiction clause contained in the Contractor Services Agreement ("CSA") between Perficient and Protiviti, which provides in relevant part:

> P.  Governing Law.  This Agreement is accepted and entered into in the State of Missouri. Any dispute in the meaning, effect, or validity of this Agreement will be resolved in accordance only with the laws of the State of Missouri without regard to the conflict of laws provisions of the State of Missouri. The parties irrevocably agree that the exclusive forum for any suit, action, or other proceeding arising out of or in any way related to this Agreement shall be in The Circuit Court of St. Louis County (state) or The United States District Court for the Eastern District of Missouri (federal) and Contractor agree to the exclusive personal jurisdiction and venue.

11.     A true and accurate copy of the most recent Non-Competition Agreement between Perficient and Protiviti is attached hereto as *Exhibit D* and incorporated herein by reference.

12.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Perficient's claims occurred in this

14958422.v1

District, and by virtue of the Non-Competition Agreement between Perficient and Livingston, and by virtue of the CSA between Perficient and Protiviti.

**FACTS COMMON TO ALL COUNTS**

13.     All preceding paragraphs are incorporated by reference.

**A.     Perficient's technology consulting and implementation services**

14.     Perficient is in the business of providing technology consulting and sales optimization services and software products to its business customers.  Perficient's services include consulting regarding technology solutions and software implementation services for a variety of business software products manufactured by third-party software vendors.

15.     The business software for which Perficient performs its implementation services typically cannot be used by the end user business customer out of the box; it needs to be formatted to operate with the end user's systems, hardware, and data; Perficient specializes in this implementation work.  Perficient also performs top-down software solution design consultation involving creating new software solutions from multiple sources and platforms.

16.     Perficient generates a portion of sales for its implementation services direct through sales to the end user through Perficient's executives and sales representatives ("direct sales").

17.     Perficient also generates a portion of sales for its implementation services through its referral relationships with the software vendors; after the vendor sells its software to the end user, it refers the end user to Perficient for the required implementation ("channel sales").

18.     A portion of Perficient's business presently and during all times relevant to this action was the marketing, distribution, and sale of software implementation services related to artificial intelligence ("AI") and machine learning.

19.     Perficient's AI services include, for example, the development and implementation of online chatbots. A chatbot is a type of software that can automate conversations and interact

4

with people through messaging platforms, in lieu of providing direct contact with a live human agent.  Chatbots use AI to convincingly simulate the way a human would behave as a conversational partner.

20.     A portion of Perficient's business presently and during all times relevant to this action was the marketing, distribution, and sale of software implementation services related to Internet of Things ("IoT").

21.     IoT describes the network of physical objects other than computers that are embedded with sensors, software, and other technologies for the purpose of connecting and exchanging data with other devices and systems over the internet.

22.     Perficient's IoT services included, for example, the integration of IoT data and IoT enabled devices with other technologies, including AI.

23.     Protiviti is also a technology consulting firm.  Protiviti represents it is a global consulting firm providing consulting services in finance, technology, operations, data, analytics, governance, risk, and internal audit.

24.     Perficient and Protiviti are competitors for technology consulting services across a broad spectrum of software and technology solutions, including AI and IoT applications.

**B.  Livingston's employment by Perficient**

25.     Livingston worked for Perficient from May 2013 until her resignation effective January 29, 2021.  Her job title was Director until her promotion in January 2020.  From then until her resignation, Livingston's title was Managing Director of Perficient's AI practice.  At all relevant times, Livingston operated in the New York metropolitan area.

26.     Livingston is a highly compensated and sophisticated businessperson with advanced degrees in mechanical engineering, including a master's degree from Columbia University.

27.     In addition to her job titles as Director and Managing Director, Livingston also served as Chief Strategist for Perficient's AI practice, one of ten Chief Strategists company wide.

28.     Perficient's Chief Strategists are acknowledged leaders in their field and can effectively communicate to define, develop, and implement business and technical strategies for Perficient's clients.

29.     The objective of the Chief Strategist designation is to provide a comprehensive alignment across Perficient's various business units and product/service offerings to deliver comprehensive client service and reduce competition in subsequent engagements.

30.     As a Chief Strategist for Perficient's AI practice, Livingston was expected, *inter alia*, to participate in strategic conversations with client executives in support of strategic opportunities and regularly provide updates and insights on her areas of expertise to the other Chief Strategists and Perficient's sales personnel.

31.     As a Director and Managing Director, Livingston was responsible to oversee and design all of Perficient's AI solutions.  In addition to her billable assignment responsibilities for AI projects, Livingston participated in non-billable tasks related to sales and business development for Perficient's AI practice, including sales support, practice-building, and responses to requests for proposals.

32.     As a Director and Managing Director, Livingston materially participated in the authorship and creation of Perficient marketing materials, including presentations and engagement

solicitation materials that referenced Perficient's capabilities in both AI, IoT, and other technologies.

33.     As a Director and Managing Director, in addition to her technical technology consulting duties, Livingston was responsible for personally interfacing with Perficient's customers and business partners in two ways: (1) Livingston met with the end-user customer for pre-sales, designing AI software solutions, sales support, and to gather business and technical requirements for projects, and (2) Livingston interfaced directly with Perficient's software vendor partners, and their employees and executives, to position Perficient for further channel sales.

34.     At the time of Livingston's initial employment with Perficient, Perficient was an IBM AI software partner, with Perficient using IBM's AI platform Watson to create software solutions for Perficient's and IBM's shared clients.

35.     Within the IBM partnership, IBM provided Perficient with the majority of its AI work through referral business and channel sales.

36.     Under Livingston's leadership, Perficient substantially expanded its AI practice to other software platforms, including Microsoft Synapse, Google Brain, and others, to create software solutions, including customized "best of breed" solutions for Perficient's clients.

37.     With Microsoft, Google, and other platforms, Livingston and Perficient generated sales through direct customer solicitation and requests for proposals, and less by referral as Perficient does with IBM.

38.     Livingston played a key role in interacting directly with end user customers to select and design the optimal AI solution, including stitching together multi-platform solutions using software platforms from multiple vendors.

39.     Based on the expansion and proliferation of AI technology in business in the last several years, many software vendors are threading AI functionality through their other software products.   Therefore, Perficient's AI practice under Livingston frequently interfaced with Perficient's other software-specific business groups, including its data analytics group, healthcare industry practice, Microsoft practice, and financial services industry practice.

40.     Livingston was personally involved in numerous interdisciplinary projects involving the integration of AI with other software products to create a comprehensive software solution for Perficient's clients.

### C.  Livingston's work on Perficient's Client X[2] project.

41.     There is substantial crossover between Perficient's AI practice and its Digital Strategy practice, and the practices areas frequently collaborate on client projects that require both AI solutions and form part of Perficient's Digital Strategy consulting services, which include IoT solutions.

42.     As a result, leadership employees in both practice areas have substantial knowledge regarding their counterparts' expertise and past projects.

43.     During her tenure as a Perficient employee, Livingston led a project to design and implement an AI-based chatbot for a Perficient client (hereinafter referred to as "Client X") to be used on the website of Client X's client (hereinafter referred to as "Entity Y"), an automobile manufacturer, and its subsidiaries and affiliates.

44.     On information and belief, Client X handles customer-facing marketing for Entity Y in North America.

---

[2] Client and project name are withheld from this pleading to protect Perficient's and the Client's confidential information.

45.     The chatbot was designed to interface with customers visiting the Entity Y website and provide conversational responses to requests for information regarding Entity Y automobiles and schedule customized test drives through Entity Y's dealer network.

46.     Livingston served as the primary architect and project lead of Entity Y's chatbot.

47.     Although the initial function of the chatbot design was to be web-based, part of Client X's and Entity Y's requested parameters for the chatbot was that the architecture be designed to integrate in the future with IoT enabled devices.

48.     Specifically, Client X and Entity Y specified the chatbot design be designed to interface in the future with additional platforms to be used by Entity Y and its dealerships.  Client X and Entity Y's planned rollout included the following:

      a.     First, the chatbot would operate on the web;

      b.     Second, the chatbot would interface with customers via mobile devices and apps;

      c.     Third, the chatbot would interface with customers through non-computer IoT devices, including "smart home" hubs such as Amazon Alexa or Apple Siri enabled devices;

      d.     Finally, the chatbot would interface with customers through in dashboard IoT enabled Entity Y vehicles.

49.     Part of Perficient's sales process for the chatbot implementation, in which Livingston was also personally engaged, involved selling the future IoT application and integration for the chatbot.

50.     In her capacity as Perficient's Chief Strategist for AI, Livingston also proposed additional future Perficient offerings involving AI and IoT integration.

51.     Even after her resignation, Livingston continued to receive communications from Perficient's software partners regarding AI and IoT integration solutions.  See a redacted copy of email correspondence from Perficient's software partner, attached as *Exhibit M*.

9

52.     In a separate email Livingston received from Intel, Intel refers to AI and IoT as the "Dynamic Duo" for technology solutions.   *Exhibit N.*

**D.  Livingston's access to Perficient's confidential information.**

53.     During Livingston's employment, she had access and exposure to all of Perficient's solutions, sales, and marketing strategies and the customers targeted by Perficient for those products and services.

54.     Her role as Chief Strategist afforded Livingston access to Perficient's planned strategies, solutions, and marketing for its business units company-wide and outside of the AI practice.

55.     The information and knowledge obtained by Livingston during the course of her employment was and is exactly the type of confidential trade secret information that, if used by Livingston for the benefit of a competitor, would cause significant and irreparable harm to Perficient.

56.     Livingston also directly participated in preparing bids, proposals, responses to requests for proposals ("RFPs"), and other sales support materials for business Perficient was trying to win, for both direct sales and channel sales.

57.     Livingston was also responsible the management of AI solutions, including identifying and preparing the statement of work ("SOW") for individual technology consulting projects, which required her to analyze client needs, assign appropriate Perficient personnel, and price the project while working within Perficient's margin guidelines.

58.     In conjunction with these responsibilities, Livingston had access to significant, confidential materials of Perficient, including current and prospective customer lists; the proprietary, internal program, polices and written strategies for new business development; the

proprietary, internal programs, policies and written strategies for business and customer maintenance; and the list of contacts with the customer targets.

59.     These programs, policies, written strategies, target customer lists, and contact lists all are maintained as highly confidential within Perficient, and provide Perficient with a significant strategic advantage in the development and maintenance of its business.

60.     Therefore, in connection with Livingston's employment, Livingston and Perficient executed two relevant contracts governing Perficient's confidential information; first, at the time she joined Perficient, Livingston executed the Confidentiality and Intellectual Property Assignment Agreement ("Confidentiality Agreement"), effective July 19, 2013.   A true and accurate copy of the Confidentiality Agreement is attached as *Exhibit B*.

61.     Further, as a Director and later Managing Director, Livingston had substantial additional responsibility and access to Perficient's confidential information that non-management Perficient employees did not.

62.     As a Director and Managing Director, Livingston had access to Perficient's confidential information, including access to password-protected databases and servers.

63.     Perficient takes steps to restrict access to company-wide confidential information, including password-protected login to certain databases and servers, which exclude non-management employees from sensitive company information.

64.     Livingston further participated in routine management-level conference calls, discussing, *inter alia*, company-wide strategy, sales, Perficient margin goals, and customer targets.

65.     Therefore, in order to protect Perficient's confidential information, Livingston and Perficient entered into the Non-Competition Agreement referenced above, first effective January 23, 2017 and renewed upon each stock award, last renewed effective February 24, 2020.[3]

66.     As consideration for her agreements to covenants contained in the Non-Competition Agreement and access to Perficient's confidential information, Livingston received substantial additional compensation in addition to her ordinary salary in the form of annual awards of Perficient restricted stock.

67.     The Non-Competition Agreement provides for Livingston's electronic acceptance of its terms by acceptance of the restricted stock awards:

> *By your electronic acceptance of this Restricted Stock Award you agree to the terms and conditions outlined in the Restricted Stock Award Agreement and the 2012 Long Term Incentive Plan.*
>
> *Exhibit A-1*, execution page (emphasis in original).

68.     In total, Livingston received 10,014 shares of Perficient restricted stock, which vested under the schedule set forth in the Non-Competition Agreement.  The current value of the restricted shares awarded is approximately $600,000.

69.     Livingston accepted the restricted stock awards for each year she was eligible as a Director and Managing Director.

70.     Each of the contracts was executed and effective in Missouri.

### E.  The Non-Competition Agreement

71.     The Non-Competition Agreement includes, among other things, an acknowledgement from Livingston that, in her position as Director and Managing Director, she

---

[3] The parties entered into a renewed Non-Competition Agreement upon every issuance of Perficient stock to Livingston.  The relevant substantive terms of each Non-Competition Agreement are identical.  Accordingly, all quotations and references are to *Exhibit A-1*, the most recently issued document, in effect at the time of Livingston's resignation.  Additional copies for prior awards are attached hereto as *Exhibits A-2 -A-5.*

14958422.v1

would receive trade secrets and other Confidential Information, which the Non-Competition Agreement defined as: "any and all proprietary information and materials, as well as all trade secrets, belonging to the Corporation, its affiliates, its customers, or other third parties who furnished such information, materials, and/or trade secrets to the Corporation with expectations of confidentiality." *Exhibit A-1*, ¶ 15(b).

72.     Confidential Information under the Non-Competition Agreement falls under five categories, regardless of whether such information or material is explicitly identified or marked as confidential or proprietary:

    a.    Inventions and technical information of the Corporation, its affiliates, its customers or other third parties, including computer programs, software, databases, know-how, code, programming techniques, discoveries, inventions, designs, developments, improvements, copyrightable and patentable material, original works of authorship, and trade secrets;

    b.    non-public business information of the Corporation, its affiliates or its customers or other third parties including business plans and strategies, compensation data, non-public financial results and information, non-public sales, marketing, sales volume and profitability data (including by office, business partner, or product), pricing, margins, costs, bidding and marketing strategies, information regarding the skills, compensation and contact information of employees and contractors of the Corporation or its Subsidiaries, and similar items;

    c.    Corporation and Subsidiary customer lists and customer and prospect information (including sales volume, purchasing history, key contacts, needs, plans, requirements, expectations, and upcoming projects);

    d.    information relating to future plans of the Corporation, its affiliates or customers, including marketing strategies, sales plans, pending projects and proposals, research and development efforts and strategies, and similar items;

    e.    other information of the Corporation, its affiliates, its customers or other third parties that grants an advantage over others in the industry by virtue of not being generally known.

*Exhibit A-1*, ¶ 15(b).

73.     The Non-Competition Agreement conditioned Livingston's employment and receipt of certain Perficient stock awards on her acknowledgment that her position entailed necessary access to Confidential Information as defined by the agreement:

> In the course and scope of employment with the Corporation or its Subsidiary, Employee will use and have access to Confidential Information (as defined below) belonging to the Corporation or its Subsidiaries above and beyond any Confidential Information previously received by Employee and will associate Employee with the goodwill of the Corporation and its Subsidiaries above and beyond any prior association of Employee with that goodwill.  In return, Employee agrees at all times during the term of Employee's employment with the Corporation or its Subsidiary and thereafter not to directly or indirectly use or disclose (except as may be required for Employee to perform Employee's duties for the Corporation or its Subsidiary) any Confidential Information without the prior and specific written authorization of the Corporation, and not to use Employee's association with the Corporation's goodwill for the benefit of any person or entity other than the Corporation or its Subsidiaries.

> *Exhibit A-1*, ¶ 15(a)

74.     In order to enforce Livingston's promises regarding Confidential Information and to protect Perficient's trade secrets, employee relationships, and customer relationship and contacts, Livingston agreed to certain covenants to continue post-termination, including the covenant not to compete, the covenant not to solicit Perficient's customers or employees, and the covenant not to disclose Confidential Information and trade secrets.

### i.     The non-competition covenant

75.     Livingston agreed in the Non-Competition Agreement not to engage in a competing business with Perficient, or to perform competing duties, for a period of twenty-four months following termination of her employment:

> (iii)   engage in a Competing Business anywhere within the Restricted Area;

> (iv)    perform any Competitive Duties (as an employee, consultant or otherwise) anywhere within the Restricted Area for any Competing Business[.]

> *Exhibit A-1*, ¶ 15(e).

14

76.　　"Competing Business" is defined to include: "any person or entity that offers, markets, provides or is demonstrably planning to offer, market or provide any Competitive Products or Services." *Exhibit A-1*, ¶ 2(e).

77.　　"Competitive Duties" are defined to include:

> duties on behalf of a Competing Business that relate to Competitive Products or Services in any way and: (i) are substantially similar to the duties the Employee performed or hereafter performed for the Corporation or its Subsidiaries; (ii) involve management (in any capacity), operation, advice or control of a Competing Business; (iii) are performed in the capacity of a director, officer, general partner, manager or executive of a Competing Business and relate to Competitive Products or Services; or (iv) involve the sale or marketing of any Competitive Products or Services.
>
> *Exhibit A-1*, ¶ 2(f).

78.　　"Competitive Products or Services" are defined to include:

> any products or services that are of a type or nature that are an alternative to, the same, as similar to any of the products or services being offered, sold, provided, marketed, or actively developed (as evidenced by internal company documents and records of the Corporation or its Subsidiaries) by the Corporation or any of its Subsidiaries as of the date hereof or as of the date of the termination of Employee's employment with the Corporation or one of its Subsidiaries for any or no reason (or, if applicable, as of the time prior thereto when Employee seeks to engage in any activity prohibited by this Agreement).
>
> *Exhibit A-1*, ¶ 2(g).

79.　　In conjunction with the non-competition covenant, Livingston also agreed to disclose her subsequent, post-termination employment relationships:

> For a period of twenty-four (24) months immediately following the termination of Employee's employment, Employee promises to disclose (within seven calendar days) to the Corporation in writing any employment, consulting, or other service relationship Employee enters into after the termination of Employee's Service.
>
> *Exhibit A-1*, ¶ 15(g).

### ii.    The non-solicitation covenant

80.     Livingston additionally agreed in the Non-Competition Agreement not to participate directly or indirectly in the solicitation of any employee, contractor, or consultant of Perficient for a period of twelve months following her separation from Perficient:

> directly or indirectly: solicit, recruit, hire, or otherwise interfere with the employment or engagement of any employee, contractor, or consultant of the Corporation or any Subsidiary who was an employee, contractor or consultant of the Corporation or any Subsidiary during the last twelve (12) months of Employee's employment with the Corporation or any Subsidiary.

> *Exhibit A*, ¶ 15(e)(ii).

81.     Additionally, Livingston agreed not to solicit any of Perficient's clients or prospective clients for competitive products or services for a period of twenty-four months following termination:

> directly or indirectly: (A) solicit (or assist another in soliciting) any Covered Client or Prospective Client for Competitive Products or Services, or (B) provide (or assist in another in providing) Competitive Products or Services to any Covered Client or Prospective Client[.]

> *Exhibit A-1*, ¶ 15(e)(i).

82.     "Covered Client" includes any business partner, client or customer of Perficient with whom Livingston or someone under Livingston's management had contact during the last twelve months of her employment. *Exhibit A-1*, ¶ 2(i).

83.     "Prospective Client" includes any identified person, entity, or business concern that Perficient spent time and/or resources courting or developing as a potential user of Perficient's products or services, or had entered into specific discussions with Perficient regarding the potential use of services or products. *Exhibit A-1*, ¶ 2(m).

### iii.    The non-disclosure covenant

84.     Livingston further agreed not to disclose, divulge or communicate to any person, firm or entity the confidential information, to return it upon termination of the parties' relationship, and that any disclosure would cause irreparable harm to Perficient and its present and future business interests.

85.     Specifically, Livingston agreed that for twenty-four months following termination, she would not:

> fail to abide by and comply with the restrictions on the use and disclosure of Confidential Information and trade secrets contained herein or in any other agreement now or hereafter entered into by the Employee with or for the benefit of the Corporation and its Subsidiaries, including, but not limited to, the Confidentiality Agreement.

*Exhibit A-1*, ¶ 15(e).

### iv.    Necessity of the covenants

86.     For each of the covenants in the Non-Competition Agreement, Livingston agreed that the restrictions were necessary, as she agreed irreparable damage will result to Livingston in the event of the breach of any covenant. *Exhibit A-1*, ¶ 16(a).

87.     Livingston further acknowledged that the restrictions contained in Non-Competition Agreement were reasonable, did not impose a greater restraint than is necessary to protect the Confidential Information, goodwill, and other legitimate business interests of Perficient, and were not unduly burdensome to Employee. *Exhibit A-1*, ¶ 16(b).

88.     Livingston further acknowledged that Perficient competes through North America and the scope of the limitations is reasonable and necessary for the protection of Perficient's Confidential Information, goodwill, and other legitimate business interests.  *Exhibit A-1*, ¶ 16(b).

14958422.v1

89.     Livingston further agreed that the restrictions allowed her an adequate number and variety of employment alternatives, based on her varied skills and abilities, and she represented that she was willing and able to engage in other employment not prohibited by the Non-Competition Agreement. *Exhibit A-1*, ¶ 16(b).

### v.     Remedies

90.     Livingston also agreed that in the event of her breach of any of the covenants in the Non-Competition Agreement, Perficient would be entitled to its reasonable costs and attorneys' fees:

> **Remedies.**  If the Corporation incurs legal fees and other expenses to enforce this Agreement and/or seek redress for any violation, Employee promises and agrees to pay all costs, court costs, fees and expenses, including reasonable attorneys' fees, incurred by the Corporation to enforce this Agreement whether by an action to enforce specific performance or for damages for Employee's breach or otherwise and/or recover and collect damages for any violation, whether or not litigation is commenced.  This is in addition to and not in lieu of any other remedies which the Corporation may have for any violation of this Agreement.
>
> *         *         *
>
> **Counterparts; Missouri Governing Law; Attorneys' Fees** This Agreement and all other aspects of the Employee's employment shall be governed by and construed and interpreted in accordance with the internal laws of the State of Missouri without reference to conflicts of law principles, or any rule or decision that would defer to the substantive laws of another jurisdiction. In the event a court of competent jurisdiction determines that the Employee breached this Agreement, including the covenants of confidentiality and non-disclosure contained in this Agreement, in any manner, the Corporation shall also be entitled to its reasonable costs and attorneys' fees associated with any legal or equitable action against the Employee relating to the Employee's breach of this Agreement, including a breach of the covenants of confidentiality and non-disclosure contained in this Agreement.
>
> *Exhibit A-1*, ¶ 13, 29.

18

### F.  The Confidentiality Agreement

91.         In addition to the covenants contained in the Non-Competition Agreement, executed on an annual basis, the Confidentiality Agreement executed at the time she first joined Perficient remained in effect.

92.         In the Confidentiality Agreement, Livingston agreed not to disclose any of Perficient's intellectual property:

> Except as may be expressly required by the Company, Employee shall not, either during Employee's employment by the Company or thereafter, directly or indirectly, disclose any Intellectual Property to any other person or use any Intellectual property for Employee's own benefit or for the benefit of others.

> *Exhibit B*, p. 2.

93.         Livingston further acknowledged her position required Perficient to provide her with Confidential Information and promised "to hold in the strictest confidence and use Employee's best efforts and the utmost diligence to protect and safeguard all Confidential Information[.]"  Livingston further agreed "not to use, directly or indirectly, (except as may be required for Employee to perform Employee's duties for the Company) or to disclose to any person or entity any Confidential Information, without the prior and specific written authorization of the Company."  *Exhibit B*, p. 3.

94.         Confidential Information, defined to include, without limitation and regardless of whether such information or material is explicitly identified or marked as confidential or proprietary:

> (i)      technical information of the Company, its affiliates, its customers or other third parties, including computer programs, software, databases, know-how, formulae, compositions, processes, discoveries, machines, inventions, designs, developmental or experimental work, improvements, original works of authorship, training programs and procedures, diagrams, charts, and similar items;

(ii)    business information of the Company, its affiliates, its customers or other third parties, including business pans, compensation data, sales data, customer lists and information, supplier lists, prices and costs, credit information, financial data, information regarding the skills, compensation, and contact information of employees and contractors of the Company, and similar items;

(iii)    information relating to the future plans of the Company, its affiliates, its customers or other third parties, including marketing strategies, sales plans, pending projects and proposals, research and development efforts and strategies, and similar items;

(iv)    other valuable, confidential information and trade secrets of the Company, its affiliates, its customers or other third parties; and (v) any information or material that grants an advantage over others in the industry by virtue of not being generally known.

*Exhibit B*, p. 3.

95.    Livingston also agreed to the non-solicitation of Perficient's customers as well as her obligation to refrain from providing any competitive products or services to Perficient customers for a period of twenty-four months:

(a) directly or indirectly: (i) solicit (or assist another in soliciting) any Covered Client or Prospective Client for Competitive Products or Services, or (ii) provide (or assist another in providing) Competitive Products or Services to any Covered Client or Prospective Client[.]

*Exhibit B*, p. 3.

96.    Livingston also agreed to the non-solicitation of Perficient's employees for a period of twenty-four months following her separation from Perficient:

(b) directly or indirectly: (i) encourage (or assist another in encouraging) any employee, contractor, consultant, supplier, or vendor of the Company to terminate his or her relationship with the Company; or (ii) solicit (or assist another in soliciting) for employment or other personal service engagement any employee, contractor, or consultant of the Company or any person who was an employee, contractor, or consultant of the Company at any time during the last twelve (12) months of Employee's employment with the Company.

*Exhibit B*, p. 3-4.

97.     "Competitive Products or Services" under the Confidentiality Agreement includes "any products or services being offered, marketed, or actively developed by the Company as of the date of the termination of Employee's employment with the Company for any or no reason." *Exhibit B,* p 4.

98.     "Covered Client or Prospective Client" under the Confidentiality Agreement means "(i) any of the Company's clients or Prospective Clients with whom the Employee had contact (whether in person, by phone, by e-mail, or otherwise) as an employee of the Company during the last twelve (12) months of the Employee's employment; and (ii) and of the Company's clients or Prospective Clients about whom Employee had an Confidential Information during the last twelve (12) months of Employees employment.  *Exhibit B*, p. 4.

99.     Livingston agreed that irreparable damage would result to Perficient in the event of any breach of any covenant under the Confidentiality Agreement, and that in the event of breach, Perficient would be entitled to "an injunction to restrain the violation of these covenants of confidentiality and non-disclosure[.]"  *Exhibit B*, p. 4.

100.    Livingston further acknowledged that the restrictions on competition contained in the Confidentiality Agreement are reasonable and do not impose a greater restraint than is necessary "to protect the Confidential Information, goodwill, and other legitimate business interests" of Perficient, and are not unduly burdensome to Livingston.  *Exhibit B*, p. 4.

### G.  Perficient's Master Services Agreement with Protiviti

101.    Although Perficient and Protiviti are competitors for technology consulting and software implementation services, Perficient also utilizes Protiviti as a contractor for its auditing services.

14958422.v1

102.     On or about September 8, 2006, Perficient and Protiviti entered into an agreement titled Master Services Agreement ("MSA"), whereby Perficient engaged Protitivi to provide auditing services required by the Public Company Accounting Reform and Investor Protection Act, also known as the Sarbanes-Oxley Act of 2002.   A copy of the MSA is attached as *Exhibit C*.

103.     Perficient and Protiviti acknowledged the MSA required the exchange of confidential business information, which each party promised to protect:

> **Confidential Information.**   Each party agrees to protect the other party's Confidential Information in a reasonable and appropriate manner and in accordance with any applicable professional practices and to use and reproduce Confidential Information only to perform its obligations under this Agreement or for its internal collection, analysis and training purposes.   Confidential information is any information disclosed to the recipient under circumstances that would lead a reasonable person to understand that such information is confidential or proprietary in nature except for information that (i) is or becomes generally available to the public without breach by recipient of its confidential obligations, (ii) is received by recipient from a third party without restriction against disclosure, (iii) was know to recipient without restriction prior to disclosure (iv) is independently developed by recipient without use of discloser's confidential information, or (v) is publicly disclosed pursuant to any legal requirement or order, or pursuant to any rule or regulation of any stock exchange or national securities quotation system, governing either the recipient or the disclosing party.

> *Exhibit C*, Par. 5.

104.     Due to the highly sensitive nature of the auditing process, including the sharing of confidential business operations, the parties each agreed not to hire or solicit for hire any employees of the other party.   The MSA contains a liquidated damages provision in the amount of one year's annual salary for breach of the provision:

> **Engagement Team Restrictions**…. For a period commencing as of the date of this Agreement and ending one (1) year from the date that a Protiviti employee or subcontractor stops providing services to Client [Perficient] under this Agreement, neither Client nor Protiviti, nor any of their respective affiliates, shall hire or solicit any employees or subcontractors of the other party without paying the party for whom the individual was employed or worked as a subcontractor, a fee equal to the

annual salary or subcontractor revenue of such individual.  The restrictions on solicitation or hiring set forth in this Section will not apply to any employee or contractor who was terminated prior to solicitation.

*Exhibit C*, Par. 12.

### H.  Perficient's Contractor Services Agreement

105.     In addition to the MSA, Perficient and Protiviti entered into the CSA on July 2, 2019.  *Exhibit D*.

106.     The express duration of the CSA was one year, or July 2, 2019 to July 2, 2020. *Exhibit D*, ¶ 7(A).

107.     Perficient and Protiviti acknowledged the CSA required the exchange of confidential business information, which each party promised to protect.  *Exhibit D*, ¶ 5(A)-(H).

108.     To protect the exchange of Perficient's confidential information, Protiviti acknowledged and agreed certain restrictions on its activities during and after the engagement with Perficient were necessary to protect Perficient's business interests.  Therefore, for a period of twelve months following the termination of the CSA, Protiviti agreed not to directly or indirectly, to recruit, solicit for hire, utilize, engage to provide services, or employ any person employed by Perficient without Perficient's prior express written consent.  *Exhibit D*, ¶ 6(C).

109.     Protiviti further agreed to indemnify Perficient for all "losses…cost, expenses, claims and damages, including all expenses of litigation, reasonable attorney's fees and court costs which Perficient may at any time suffer or sustain" in connection with, inter alia, any breach of any term of the CSA.  *Exhibit D*, ¶ 9.

110.     Relatedly, Protiviti explicitly agreed that if Perficient commenced any action against it and Protiviti is determined to have breached any provision of the CSA, Protiviti will

reimburse Perficient for all of its reasonable costs, expenses and attorneys' fees incurred.  *Exhibit D*, ¶ 11(N).[4]

### I.   **Livingston's resignation and employment by Protiviti**

111.     Despite Livingston's covenants not to compete with Perficient and Protiviti's agreement not to hire or solicit any Perficient employees, Protiviti began soliciting Livingston through a third party for hire in the summer of 2020.

112.     On or about January 5, 2021, Protiviti made Livingston an offer of employment to serve as its Managing Director – Technology Consulting – Emerging Technologies: Internet of Things (IoT), to commence employment on February 8, 2021.

113.     Livingston resigned from Perficient on or about the next day, January 6, 2021, to be effective January 29, 2021.

114.     Livingston subsequently and immediately commenced employment with Protiviti. Her job title with Protiviti, Managing Director, is the same job title she held with Perficient. Livingston's LinkedIn profile is attached hereto as *Exhibit E*.

115.     In that capacity, Livingston is currently participating in the active marketing, selling and/or implementation of technology consulting and software implementation services on behalf of Protiviti.

### J.   **Perficient's attempts to confirm Livingston's compliance with her restrictive covenants**

116.     Because Livingston failed to abide by her contractual promise to inform Perficient of her subsequent employment, Perficient obtained notice of Livingston's employment by Protiviti via Livingston's Linkedin.com profile on or about February 6, 2021.

---

[4] In addition to the jurisdiction and venue recitations set forth above, the CSA provides that the exclusive forum for any disputes arising out of its terms will be in the Circuit Court of St. Louis County, Missouri, or the United States District Court for the Eastern District of Missouri.  *Exhibit D*, ¶ 11(P).

14958422.v1

117.     Because Livingston's job duties were apparently competitive with her job duties at Perficient, Perficient sent correspondence through counsel on or about February 11, 2021, which (1) reminded Livingston and informed Protiviti regarding Livingston's restrictive covenants, and (2) requested an explanation of Livingston's job responsibilities with Protiviti in order to assess whether Livingston's employment resulted in a breach of any of her restrictive covenants with Perficient.  Copies of Perficient's February 11, 2021 correspondence with Livingston and Protiviti are attached as *Exhibits F* and *G.*

118.     On February 12, 2021, counsel for Livingston responded via correspondence in which Livingston claimed she intended to abide by her restrictive covenants and claimed her Protiviti responsibilities do not include artificial intelligence or machine learning.   A copy of Livingston's February 12, 2021 correspondence is attached as *Exhibit H.*

119.     On February 16, 2021, counsel for Perficient and Livingston engaged in a telephone conference, in which Perficient requested certain additional documents necessary to evaluate Livingston's job responsibilities and the threat posed to Perficient's protectable interests.  Counsel for Livingston informed Perficient those documents were in Protiviti's exclusive custody and control.

120.     Accordingly, on February 16, 2021, counsel for Perficient sent additional email correspondence to Protiviti, requesting the documentation necessary to evaluate Livingston's duties, including: (1) any recruitment materials in relation to Ms. Livingston's hiring, including the posting for the position and any recruiting materials promulgated by Protiviti or a recruiting firm, (2) a job description for Ms. Livingston's position, (3) a complete list of all technologies and software to be implemented by Ms. Livingston or those under her supervision, (4) a Protiviti organizational chart showing Ms. Livingston's position, those employees under her supervision,

and those she will report to, (5) a detailed description of the sales, pre-sales, and partnership building and management responsibilities of Ms. Livingston and her direct and indirect reports; and (6) a detailed description of all internal procedures and safeguards enacted by Protiviti to prevent Ms. Livingston's interaction with any Protiviti practice areas that were included in her Perficient responsibilities.  A copy of Perficient's February 16, 2021 email correspondence is attached as *Exhibit I*.

121.     Protiviti responded via correspondence on February 17, 2021.   In that correspondence, Protiviti asserts Livingston's responsibilities will be limited to IoT applications, but did not provide any specific details regarding Protiviti's offerings in that area.  Protiviti further did not provide any of the documentation previously requested by Perficient necessary to evaluate Livingston's job responsibilities or to assess the risk to Perficient's protectable interests caused by Livingston's employment by a competing business.   A copy of Protiviti's February 17, 2021 correspondence is attached as *Exhibit J*.

122.     Therefore, on February 23, 2021, Perficient again sent correspondence renewing its request for materials necessary to evaluate Livingston's job duties and the competitive risk to Perficient's protectable interests.  A copy of Perficient's email correspondence is attached as *Exhibit K*.

123.     Finally, on February 26, 2021, Protiviti sent correspondence identifying the technologies within her job duties and attaching redacted onboarding materials including a job description and job posting identifying the duties for Livingston's position.  A copy of Protiviti's February 26, 2021 correspondence and its enclosures is attached as *Exhibit L*.

26

124.     Contrary to Livingston's and Protiviti's prior representations, the job description and job posting materials confirm Livingston's job duties are competitive with her former responsibilities at Perficient.

125.     The skills necessary for Livingston's position include relevant experience for products she developed and services she performed for Perficient, including *inter alia*:

     a.     Understand how to leverage and commercialize AI of customer platforms (i.e. how to monetize the information of their product & systems vs. just selling hardware/software – create new business models).

     b.     Experience developing innovation solutions to address IoT weaknesses and challenges.

     c.     Demonstrated improvements on methodologies, toolsets, and offerings through independent or collaborative development work.

     d.     Develop effective business and technology strategies to help IoT asset owners improve outcomes and their customer experience.

     e.     Create new value propositions and business models to help asset owners remain competitive.

     f.     Supervisory experience of teams including Consultants, Senior Consultants, Managers, Senior Managers, and Associate Directors.

     g.     Advanced project management and status reporting capabilities.

     h.     Identify opportunities and establish a sales pipeline.

*Exhibit L.*

126.     Further, in her capacity as a Protiviti employee, Livingston will have the responsibility to develop IoT solutions using the Amazon Web Services ("AWS") and Microsoft Azure platforms.

127.     Livingston previously worked on Perficient AI solutions utilizing the AWS and Microsoft Azure platforms, and in that capacity had direct contact with Amazon and Microsoft employees and executives in relation to their partnerships with Perficient to offer those services.

128.     Therefore, in order to engage in the practice building and solution development required by her position at Protitivi, Livingston will be required to contact and work with individuals with whom she previously had contact as a Perficient employee.

129.     Additionally, in order to price, market, and implement IoT solutions on behalf of Protiviti, Livingston will rely on competitive information she acquired while at Perficient, resulting in the actual and/or inevitable disclosure of Perficient's confidential information and trade secrets.

130.     Furthermore, on information and belief, Protiviti's IoT practice directly interfaces with its AI practice to market technology consulting and software implementation services that utilize and combine both AI and IoT functionalities.

131.     This AI/IoT integration is directly competitive with the integration of these technologies Livingston worked on for Perficient, including but not limited to her work on the Entity Y project.

132.     Specifically, contrary to Livingston's and Protiviti's prior assertions, Protiviti represents through its website, blog posts, white papers, and other marketing materials the connected nature and possibility for integrated solutions utilizing both AI and IoT technologies.

### K. Livingston's continued competitive employment presents a threat to Perficient's protectable interests.

133.     On the basis of her former employment with Perficient, Livingston is in possession of confidential non-public business information of Perficient, including its sales strategies, pricing structure, the details of its contractual relationships with partners and vendors, non-public financial information, sales volume and profitability data, margins, costs, marketing strategies, customer contacts, information regarding the future plans and development strategies of Perficient, and information regarding Perficient's capabilities and personnel.

134.     Livingston may improperly use the Confidential Information for the benefit of Protiviti and the detriment of Perficient, either intentionally, or via inevitable unintentional disclosure.

135.     Despite Perficient's repeated requests, Livingston and Protiviti have failed to identify any measures either party have taken to isolate Livingston from Protiviti's AI practice and personnel to prevent the actual and/or inevitable disclosure of Perficient's confidential information.

136.     On information and belief, in her capacity as a Protiviti employee, Livingston may continue to use contacts with customers and business partners she obtained while in the employment of Perficient, including personnel with Microsoft and Amazon, and other software vendors.

137.     Protiviti had knowledge that Livingston was subject to non-competition, non-solicitation, and non-disclosure obligations under the Non-Competition Agreement and willfully hired her despite that knowledge.

138.     Protiviti also had knowledge of its own contractual promises not to hire or solicit for hire any Perficient employee, including Livingston.

139.     Despite both Livingston's and Protiviti's knowledge of the breach, as of the date of this complaint, Livingston remains employed by Protiviti as a Managing Director.

140.     This continued employment has caused and continues to cause Perficient irreparable harm and damage.

141.     In addition, Perficient will be irreparably harmed if and when Livingston is able to inform Protiviti of or develop and implement at Protiviti (a) Perficient's proprietary, internal strategies for identifying potential clients most likely to value Perficient's services' and products' attributes and advantages; (b) Perficient's proprietary, internal programs, policies and written

strategies for development of customer targets; (c) Perficient's proprietary, internal program, policies and written strategies for business maintenance with customer targets, once new business has been obtained; and (d) otherwise provide and make available to Protiviti the partner and customer contacts and customer lists that, upon information and belief, Livingston has continued to maintain subsequent to her resignation from Perficient.

## COUNT I – BREACH OF CONTRACT – NON-COMPETITION AGREEMENT
### (Livingston)

142.     All preceding paragraphs are incorporated by reference.

143.     The Non-Competition Agreement is a valid and enforceable contract between Perficient and Livingston that includes, among other things, post-termination non-competition obligations on the part of Livingston in exchange for due consideration, including restricted stock awards.

144.     Livingston breached her contractual duties described in the Non-Competition Agreement by, among other things, engaging in the following:

   a.   Livingston is performing competitive duties as an employee within the restricted area for a competing business in obtaining employment with Protiviti, a direct competitor of Perficient;

   b.   Livingston is engaged in a competing business within the restricted area by offering the sale of identical competing services, namely technology consulting and software implementation using AI and IoT, in breach of her obligation not to perform competitive duties or offer competitive products or services.

   c.   Livingston failed to disclose her employment with Protiviti to Perficient within seven days;

   d.   By performing services for a competitor, Livingston may fail to abide by and comply with the restrictions on the use and disclosure of Perficient's Confidential Information by intentionally and/or inevitably disclosing Perficient's Confidential Information to Protiviti, including its sales strategies, pricing structure, the details of its contractual relationships with customers and partners, non-public financial information, sales volume and profitability data, margins, costs,

marketing strategies, customer contacts, and information regarding the future plans and development strategies of Perficient.

e.  By performing services for a competitor, Livingston may solicit or assist in soliciting a covered client for competitive products or services by using her prior access to Perficient's Confidential Information to directly or indirectly solicit Perficient's current and prospective customers on behalf of Protiviti, in direct competition with Perficient;

f.  Upon information and belief, Livingston has misappropriated other confidential business information of Perficient for the benefit of a competitor, seeking to impair Perficient's ability to compete in AI and/or IoT consulting market.

145.    Perficient provided all consideration required by the terms of the Non-Competition Agreement, in cash and in kind, and otherwise performed all covenants, obligations and other conditions precedent to its right to enforce the agreements against Livingston.

146.    Upon information and belief, Livingston's violation of her post-termination non-competition and non-disclosure obligations was willful and knowing.

147.    Despite Livingston's knowledge of the breach, Livingston has continued her employment with Protiviti and her other actions in violation of the non-competition and non-disclosure obligations.

148.    Perficient has been damaged and will continue to be damaged as a direct and proximate result of Livingston's actions, in that Livingston has disclosed and/or will inevitably disclose Perficient's trade secrets and other proprietary and confidential information in the employ of Protiviti, Perficient's direct competitor.

149.    Perficient is entitled to recover as damages all consideration paid in exchange for the Non-Competition agreement, including the value of Perficient stock issued to Livingston as consideration for her breached obligations.

150.    As agreed by the parties, and as contemplated by the Non-Competition Agreement, Perficient has and will continue to suffer irreparable harm as a direct result of Livingston's actions

31

unless she is preliminarily and permanently enjoined from continuing to be employed by Protiviti and otherwise continue with the actions in violation of her non-competition, non-disclosure, and non-solicitation obligations.

151.      Among other things, Livingston may continue to inform Protiviti of and use and implement on Protiviti's behalf Perficient's trade secrets and confidential information and, thus, provide Protiviti with knowledge and information that cannot be revoked.   In addition, the customer contacts generated, target customer information, and partner contacts provided to Protiviti cannot be revoked.

152.      Injunctive relief preventing Livingston from working at Protiviti during the non-competition and non-solicitation period is a reasonable and justified restriction because in exchange for valuable consideration, Livingston (a highly compensated and sophisticated individual) acknowledged and agreed to the following:

a.      That irreparable damage would result to Perficient in the event of the breach of any covenant in the Non-Competition Agreement;

b.      That in the event of such breach, Perficient would be entitled to an injunction to restrain the violation of the covenants;

c.      That the restrictions on competition contained in the Non-Competition Agreement were reasonable;

d.      That the restrictions on competition are not unduly burdensome to Livingston;

e.      That Perficient competes throughout North America (among other countries) and that the scope of the limitations is reasonable and necessary for the protection of Perficient's Confidential Information, goodwill, and other legitimate business interests;

f.      That the restrictions allow Livingston an adequate number and variety of employment alternatives, based on her varied skills and abilities;

g.      That she was willing and able to engage in other employment not prohibited by the Non-Competition Agreement.

14958422.v1

153.     Injunctive relief preventing Livingston from working at Protiviti during the non-competition and non-solicitation period is a further reasonable and justified restriction because:

     a.   During her employment with Perficient, Livingston developed business relationships for the purpose of selling its technology consulting and software implementation services and gained knowledge regarding Perficient's non-public business plans and strategies.

     b.   Protiviti is a direct competitor seeking to expand its market share in selling technology consulting and software implementation services. Therefore, Perficient has a clear interest in preventing access to Perficient's trade secrets and internal proprietary confidential information, because Protiviti would be in a position to use such trade secrets and confidential information to cause Perficient irreparable harm.

     c.   Livingston's obligations have not and should not cause her any difficulty in finding employment that does not violate the restrictions.

     d.   The sales and marketing strategies, policies and procedures, the customer and vendor contacts, and other confidential information developed and used by Livingston and those employees managed by Livingston while at Perficient remain substantially the same in the time since Livingston's departure and will continue to be substantially the same from now until the end of Livingston's non-competition, non-solicitation, and non-disclosure period.

154.     Pursuant to the Non-Competition Agreement, in the event that Livingston is in violation of her post-termination non-competition, non-solicitation, and non-disclosure obligations and Perficient is required to file suit to enforce the same, the non-competition and non-solicitation period is to be extended for the same amount of time that the suit is pending. *Exhibit A-1*, ¶ 16(c).

155.     Perficient has incurred attorneys' fees and costs in connection with its efforts to enforce the Non-Competition Agreement against Livingston and will continue to incur additional attorneys' fees and costs until this matter is resolved.

WHEREFORE, Plaintiff Perficient, Inc. respectfully prays for a judgment against Defendant Christine Livingston as follows:

14958422.v1

a.     Awarding Perficient damages in an amount to be proven at trial in excess of $75,000, plus post-judgment interest from the date of judgment until the entire amount is paid in full at the applicable statutory rate;

b.     A declaration that Livingston's employment by Protiviti and activities on behalf of Protiviti, including the solicitation of Perficient's customers, potential customers, and partners on behalf of Protiviti constitute a violation of her non-competition, non-solicitation, and non-disclosure obligations under the Non-Competition Agreement;

c.     A Preliminary and Permanent Injunction:

    i.    Enjoining Livingston from being employed by or performing any work, task or other employment-related service on behalf of Protiviti, while this suit is pending and for a period of twenty-four months after this suit is fully and completely resolved;

    ii.    Enjoining Livingston from being employed by or performing any work, task or other employment-related service on behalf of any other competitor of Perficient, while this suit is pending and for a period of twenty-four months after this suit is fully and completely resolved;

    iii.    Enjoining, both while this suit is pending and for a period of twenty-four months after this suit is fully and completely resolved, Livingston from directly or indirectly contacting or soliciting any person or company that was a customer or had been solicited by Perficient as a potential customer of Perficient for a twenty-month period prior to Livingston's resignation;

14958422.v1

iv.    Enjoining, both while this suit is pending and for a period of twenty-four months after this suit is fully and completely resolved, Livingston from directly or indirectly contacting or soliciting any person that was any employee, contractor, or consultant of Perficient or any subsidiary as a potential customer of Perficient at the time of Livingston's resignation; and

v.    Enjoining, both while this suit is pending and for a period of twenty-four months after this suit is fully and completely resolved, Livingston from taking any action which might induce any business or person dealing with Perficient to cease dealing with Perficient, reduce its level of business with Perficient, or otherwise begin dealing with someone other than Perficient.

d.    Awarding Perficient its reasonable attorneys' fees and costs incurred and that will continue to be incurred in connection with enforcing Livingston's obligations under the Non-Competition Agreement; and

e.    For such other and further relief as this Court deems just and proper.

## COUNT II – UNJUST ENRICHMENT
### (Livingston)

156.    All preceding paragraphs are incorporated by reference.

157.    As a Director and Managing Director, Livingston had substantial additional responsibility and access to Perficient's confidential information beyond that accessible to non-management Perficient employees.

158.    In order to protect the access to Perficient's confidential information afforded by her management responsibilities, Livingston and Perficient entered into the Non-Competition Agreement, in which Livingston agreed not to compete against Perficient after her employment with Perficient ended.

35

159.     In exchange for her agreement not to compete, Perficient provided substantial compensation *in addition* to Livingston's ordinary salary in the form of the annual restricted stock awards.

160.     Despite her agreement not to compete, immediately upon her resignation from Perficient, and without informing Perficient in further breach of the Non-Competition Agreement, Livingston began performing competitive duties.

161.     Because Livingston is presently in breach of her non-competition covenant, Perficient has not received the benefit of its bargain.

162.     Nevertheless, Livingston retained the benefit of the non-competition covenant by retaining the restricted stock awards which vested prior to her resignation.

163.     Livingston was materially enriched by the receipt of a benefit in the form of the restricted stock awards.

164.     Livingston's enrichment was at Perficient's expense.

165.     It would be unjust to allow Livingston to retain the benefit, because Perficient provided Livingston with substantial additional compensation beyond her ordinary salary in exchange for her promise not to compete.

166.     Perficient has made a demand on Livingston to cease her competitive conduct, and she has refused.

WHEREFORE, Plaintiff Perficient, Inc. respectfully prays that the Court grant it a judgment against Defendant Christine Livingston in an amount to be proven at trial in excess of $75,000, including but not limited to the full value of all restricted stock awards, plus post-judgment interest from the date of judgment until the entire amount is paid in full at the applicable statutory rate, awarding Perficient its costs, and for such other and further relief as the Court deems just and proper.

14958422.v1

## COUNT III – TORTIOUS INTERFERENCE WITH CONTRACT – NON-COMPETITION AGREEMENT
### (Protiviti)

167.      All preceding paragraphs are incorporated by reference.

168.      The Non-Competition Agreement executed by Livingston is a binding contract between Livingston and Perficient.

169.      Protiviti had actual notice of both the existence and terms of the Non-Competition Agreement.

170.      Upon information and belief, Protiviti has knowingly and willfully interfered with Perficient's contractual relations with Livingston by engaging in conduct designed to induce Livingston into breaching her contracts with Perficient.

171.      Protiviti's interference with Perficient's contracts with Livingston was improper in motive and/or means.

172.      Perficient has been damaged and will continue to be damaged and irreparably harmed as a result of Protiviti's tortious interference.

173.      In taking these actions, Protiviti acted intentionally, maliciously, or in reckless disregard of the rights of Perficient such that an award of punitive damages is justified.

WHEREFORE, Plaintiff Perficient, Inc. respectfully prays that the Court grant it a judgment against Defendant Protiviti, Inc. in an amount to be proven at trial, plus post-judgment interest from the date of judgment until the entire amount is paid in full at the applicable statutory rate, awarding Perficient its costs, and for such other and further relief as the Court deems just and proper.

## COUNT IV – TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
### (Livingston and Protiviti)

174.      All preceding paragraphs are incorporated by reference.

14958422.v1

175.     Livingston has tortiously interfered with Perficient's relationships, including with its current and prospective customers, by her current and prospective attempts to solicit, divert, or take away Perficient's current and prospective customers and by using her knowledge of Perficient's Confidential Information, which may be used to induce Perficient's current and prospective customers.

176.     Livingston knew or should have known that her actions would tortiously interfere with Perficient's established business relationships and contracts with employees, partners, and customers.

177.     On information and belief, Protiviti has tortiously interfered with Perficient's relationships, including with its current and prospective customers, by its current and prospective attempts to solicit, divert, or take away Perficient's current and prospective customers by employing Livingston despite being aware of her contractual obligations to Perficient, and by allowing Livingston to use her knowledge of Perficient's Confidential Information, which may be used to induce Perficient's current and prospective customers.

178.     Protiviti knew or should have known that its actions would tortiously interfere with Perficient's established business relationships and contracts with employees, partners, and customers.

179.     As a direct, proximate, foreseeable and consequential result of Defendants' tortious acts, Perficient has suffered and continues to suffer substantial damages entitling it to an award of damages permitted by applicable law, including, but not limited to, compensatory damages, disgorgement of Defendants' gain, and pre- and post-judgment interest.

180.     In taking these actions, Defendants acted intentionally, maliciously, or in reckless disregard of the rights of Perficient such that an award of punitive damages is justified.

WHEREFORE, Plaintiff Perficient, Inc. respectfully prays that the Court grant it a judgment against Defendants Christine Livingston and Protiviti, Inc. in an amount to be proven at trial, plus post-judgment interest from the date of judgment until the entire amount is paid in full at the applicable statutory rate, awarding Perficient its costs, and for such other and further relief as the Court deems just and proper.

### COUNT V – CIVIL CONSPIRACY
**(Livingston and Protiviti)**

181.     All preceding paragraphs are incorporated by reference.

182.     As Managing Director and Chief Strategist for AI, Livingston was intimately involved in many of Perficient's highly proprietary business strategies, and was privy to Perficient's specific plans, goals, and methodologies for the coming years.

183.     Upon information and belief, Protiviti was aware of Livingston's intimate knowledge and the involvement Livingston had in developing Perficient's current and future sales and business strategies for AI and integrated AI/IoT solutions.

184.     Protiviti knew Livingston executed an agreement or agreements whereby she could not share confidential information with a competitor or work for Protiviti for a certain time from the date of her separation from Perficient.

185.     Upon information and belief, Protiviti has conspired with Livingston to breach the Non-Competition Agreement and/or Confidentiality Agreement she has with Perficient, which will inevitably lead to the misappropriation of Perficient's confidential trade secrets.

186.     Perficient has been harmed and will continue to be irreparably injured by Livingston's and Protiviti's concerted actions.

187.     In taking these actions, Defendants acted intentionally, maliciously, or in reckless disregard of the rights of Perficient such that an award of punitive damages is justified.

14958422.v1

WHEREFORE, Plaintiff Perficient, Inc. respectfully prays that the Court grant it a judgment against Defendants Christine Livingston and Protiviti, Inc. in an to be proven at trial, plus post-judgment interest from the date of judgment until the entire amount is paid in full at the applicable statutory rate, awarding Perficient its costs, and for such other and further relief as the Court deems just and proper.

### COUNT VI – BREACH OF CONTRACT –
### MASTER SERVICES AGREEMENT
### (Protiviti)

188.     All preceding paragraphs are incorporated by reference.

189.     The MSA is a valid and enforceable contract between Perficient and Protiviti that includes, among other things, a contractual promise by Protiviti not to hire or solicit for hire any Perficient employee without first paying Perficient a fee equal to Livingston's annual salary.

190.     The duration of the no hire provision is one year following the termination of Protiviti's audit services.

191.     Protiviti has performed audit services for Perficient under the MSA annually since 2006 until the present.

192.     Protiviti never provided notice to Perficient of its intent to hire or solicit Livingston and has not paid Perficient any fee.

193.     Protiviti's solicitation and hiring of Livingston is a breach of the no hire provision of the MSA.

194.     Perficient provided all consideration required by the terms of the MSA, in cash and in kind, and otherwise performed all covenants, obligations and other conditions precedent to its right to enforce the agreements against Protiviti.

14958422.v1

195.     Perficient has been damaged and will continue to be damaged as a direct and proximate result of Protiviti's actions.

196.     Perficient is entitled to recover as damages the fee provided for in the MSA as liquidated damages, among other remedies.

197.     Perficient has incurred attorneys' fees and costs in connection with its efforts to enforce the MSA against Protiviti and will continue to incur additional attorneys' fees and costs until this matter is resolved.

WHEREFORE, Plaintiff Perficient, Inc. respectfully prays that the Court grant it a judgment against Defendant Protiviti, Inc. in an amount to be proven at trial in excess of $75,000, plus post-judgment interest from the date of judgment until the entire amount is paid in full at the applicable statutory rate, awarding Perficient its costs, and for such other and further relief as the Court deems just and proper.

### COUNT VII – BREACH OF CONTRACT – CONTRACTOR SERVICES AGREEMENT
### (Protiviti)

198.     All preceding paragraphs are incorporated by reference.

199.     The CSA is a valid and enforceable contracts between Perficient and Protiviti that includes, among other things, a contractual promise by Protiviti not to hire or solicit for hire any Perficient employee without Perficient's prior consent.

200.     The duration of the no hire provision is one year following the termination of the CSA, or July 2, 2021.

201.     Protiviti never provided notice to Perficient of its intent to hire or solicit Livingston, and Perficient has not provided its consent for Protiviti to hire Livingston.

202.     Protiviti's solicitation and hiring of Livingston is a breach of the no hire provision of the CSA.

203.     Perficient provided all consideration required by the terms of the CSA, in cash and in kind, and otherwise performed all covenants, obligations and other conditions precedent to its right to enforce the agreements against Protiviti.

204.     Perficient has been damaged and will continue to be damaged as a direct and proximate result of Protiviti's actions.

205.     Perficient is entitled to recover as damages all remedies set forth in the CSA, included but not limited to its attorneys' fees in relation to this action.

206.     Perficient has incurred attorneys' fees and costs in connection with its efforts to enforce the CSA against Protiviti and will continue to incur additional attorneys' fees and costs until this matter is resolved.

WHEREFORE, Plaintiff Perficient, Inc. respectfully prays that the Court grant it a judgment against Defendant Protiviti, Inc. in an amount to be proven at trial in excess of $75,000, plus post-judgment interest from the date of judgment until the entire amount is paid in full at the applicable statutory rate, awarding Perficient its costs, and for such other and further relief as the Court deems just and proper.

SANDBERG PHOENIX & von GONTARD P.C.

By:    */s/ Lyndon Sommer*
       Lyndon Sommer, #44005
       Benjamin R. Wesselschmidt, #66321
       600 Washington Avenue - 15th Floor
       St. Louis, MO  63101-1313
       314-231-3332
       314-241-7604 (Fax)
       lsommer@sandbergphoenix.com
       bwesselschmidt@sandbergphoenix.com
       *Attorneys for Plaintiff Perficient, Inc.*

14958422.v1

## VERIFICATION

I, John Jenkins, being of lawful age, hereby declare under penalty of perjury, as follows:

1.      I am the Vice President of Field Operations at Perficient, Inc.

2.      The facts alleged in the Verified Complaint are based upon matters known personally to me and/or on information provided by others within Perficient, and are true and correct to the best of my knowledge, information, and belief.


Executed within the United States of America on this ___ day of March, 2021.

John Jenkins, Vice President of Field Operations